**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| MESSER LLC f/k/a LINDE LLC, | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | NO. 18-4705 |
| v. | : | |
| | : | |
| DEVAULT PACKING COMPANY, INC. | : | |
| d/b/a DEVAULT FOODS, | : | |
| *Defendant*. | : | |

**MEMORANDUM**

**JONES, II    J.**                                                **September 29, 2020**

Messer LLC, formerly known as Linde LLC ("Messer"), commenced this action against

Devault Packing Company, Inc. ("Devault"), seeking recovery on its claim that Devault

breached the contract entered into by the parties in 2013.  Devault asserted the following

counterclaims against Messer in response: fraudulent inducement (Count I), breach of express

warranty (Count III), breach of implied warranty (Count IV), and breach of contract under two

separate theories (Counts II & V).  *See* Devault Answer and Countercls. (ECF No. 17) at ¶¶ 65–

105.  Messer has filed a Motion for Partial Summary Judgment seeking judgment as to Devault's

liability on Messer's affirmative breach of contract claim, as well as judgment against Devault

on each of its counterclaims.  *See* Messer Mot. Summ. J. (ECF No. 30).  Devault then filed its

own Motion for Partial Summary Judgment, seeking a ruling that any recovery by Messer under

its breach of contract claim must be limited by the applicable statute of limitations.  *See* Devault

Mot. Summ. J. (ECF No. 38).  It is to these Motions that the Court now turns.

## I.    FACTUAL BACKGROUND

Messer is in the business of supplying industrial gases and related equipment to other

companies.  (Messer Statement of Material Undisputed Facts ("SMUF") (ECF No. 30-2) at ¶ 1.)

Devault's primary business is supplying meat to the food service industry.  (SMUF at ¶ 3.)  The parties entered into a contract in 2013 whereby Devault agreed to rent two 30-foot impingement freezers from Messer and purchase from Messer the liquid nitrogen and carbon dioxide needed in connection with its business operations.  (SMUF at ¶¶ 7–8.)  Authorized representatives of the parties signed the following documents to memorialize their agreement: (1) the "Product Supply Agreement"; (2) the "Application Equipment, Ancillary Equipment, and Services Rider"; (3) the "Application Equipment, Ancillary Equipment, and Services Term Sheet"; (4) the "Bulk Rider"; and (5) a "Bulk Term Sheet" with respect to both nitrogen and carbon dioxide (collectively, the "Agreement").  (SMUF at ¶ 5.)

Messer installed the freezers at Devault's plant in May 2014, and Devault paid rent for the freezers monthly from June 2014 through February 2015, as set forth in the Agreement. (SMUF at ¶¶ 28–29.)  "In February 2015, the parties resolved a dispute concerning the cost of the installation of the [f]reezers"; "Devault agreed to pay for the installation costs that exceeded the original budget and, in exchange, Messer agreed to waive rental payments on the [f]reezers for March, April, and May 2015, with the [f]reezer rental [payments] to resume in June 2015." (SMUF at ¶ 30.)  Due to a purported administrative error, Messer did not resume invoicing Devault for the freezers in June 2015.  (SMUF at ¶ 31.)  After discovering the error, Messer sent Devault an invoice in November 2017 for the freezer rental payments that had accrued since June 2015.  (SMUF at ¶ 31.)  However, Devault did not believe it should have to pay Messer in full for the months in question, as it had lodged numerous complaints to Messer concerning the freezers' purportedly poor performance throughout that time period.  (Devault Resp. to SMUF (ECF No. 33-2) at ¶¶ 87–101.)  In response, starting in December 2017, Messer began to impose what Devault contends were "onerous, improper[,] and unjustified payment terms upon Devault

regarding liquid nitrogen and carbon dioxide deliveries." (Devault Resp. to SMUF at ¶ 111.) Devault responded to Messer's refusal to lift those payment terms by terminating the Agreement between the parties and entering into a new agreement with an alternative supplier of the gases needed to run its business. (SMUF at ¶¶ 39, 41.) It is undisputed that Devault used the freezers from the time they were installed in May 2014 through the summer of 2019. (SMUF at ¶ 32; Devault Resp. to SMUF at ¶ 32.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires a court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).

"If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini*, 795 F.3d at 416 (internal quotation marks omitted); *see also Celotex*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually

unsupported allegations contained in its pleadings." *Williams v. Borough of W. Chester, Pa.*, 891

F.2d 458, 460 (3d Cir. 1989) (internal citations and footnote omitted).  "[C]onclusory, self-

serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v.*

*Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (internal quotation marks

omitted).  "Instead, [an] affiant must set forth specific facts that reveal a genuine issue of

material fact." *Id.*  "In addition, a court should view the facts in the light most favorable to the

non-moving party and make all reasonable inferences in that party's favor." *Scheidemantle*, 470

F.3d at 538.

## III.    DISCUSSION

The Agreement struck by the parties contains a choice of law provision, which reads as

follows:  "New Jersey law governs all matters pertaining to the validity, construction, and effect

of this agreement, without giving effect to any principles or rules of conflict of laws that apply

the laws of another jurisdiction."  Product Supply Agreement at § 15(c) ("Governing Law").  "In

diversity cases such as this one, [courts] look to the choice-of-law rules of the forum state—the

state in which the District Court sits—in order to decide which body of substantive law to apply

to a contract [], even where the contract contains a choice-of-law clause." *Collins v. Mary Kay,*

*Inc.*, 874 F.3d 176, 183 (3d Cir. 2017).  "In Pennsylvania, 'courts generally honor the intent of

the contracting parties and enforce choice of law provisions in contracts executed by them.'"

*DePuy Synthes Sales, Inc. v. Edwards*, 23 F. Supp. 3d 472, 482 (E.D. Pa. 2014) (quoting *Kruzits*

*v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994)).

> More specifically, where a choice of law clause is concerned, the
> "law of the state chosen by the parties to govern their contractual
> rights and duties will be applied . . . unless either (a) the chosen state
> has no substantial relationship to the parties or the transaction and
> there is no other reasonable basis for the parties' choice, or (b)

4

> application of the law of the chosen state would be contrary to a
> fundamental policy of a state which has a materially greater interest
> than the chosen state in the determination of the particular issue."

*Id.*  Here, as Messer correctly states, "[t]here is a reasonable basis supporting the parties' choice

of New Jersey law, where Messer is headquartered, and there is no public policy reason that

would require the application of another state's law to this straightforward breach of contract"

action.  Messer Br. in Supp. Mot. Summ. J. ("Messer Br.") at 9.[1]  The Court will therefore give

effect to the intent of the parties, as expressed in the choice of law clause within their

Agreement, and apply New Jersey law to the claims at issue.

### A.  Messer's Claim for Breach of Contract against Devault

To prevail on a claim for breach of contract under New Jersey law, a claimant must

establish the following elements: "(1) a contract between the parties; (2) a breach of that

contract; (3) damages flowing therefrom; and (4) that the party [bringing] the claim performed its

own contractual obligations."  *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)

(citing *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J.

2002)).  Messer alleges that Devault breached the Agreement by: (1) failing to pay rent for the

freezers, and (2) purchasing liquid nitrogen and carbon dioxide from another supplier—in

---

[1] Devault did not argue in its Response in Opposition to Messer's Motion for Partial Summary
Judgment that the laws of Pennsylvania or any other state should apply to any of the claims at
issue in Messer's Motion.  However, in a footnote in its Reply Brief in Support of its own
Motion for Partial Summary Judgment, it claimed, for the first time, that "there is a dispute as to
which law applies."  Devault Reply Br. at 3 n.3.  But the only specific argument Devault makes
is that Pennsylvania law might instead apply to its argument concerning the Agreement's statute
of limitations clause, which it contends involves "a procedural question (as opposed to a
substantive question), and procedural questions are governed by the law of the forum in which
the case is proceeding."  *Id.*  The Court need not reach that question, however, as it finds
Devault's statute of limitations argument inapplicable based on the plain language of the
Agreement, as will be explained below.

violation of the exclusivity provision in the contract—after Devault's purportedly improper attempt to terminate the contract. *See* Messer Br. at 10–14. Devault makes several arguments against each of these claimed breaches. As to Messer's claim regarding freezer rental payments, Devault argues: (1) "that Messer did not invoice Devault for the freezers between early 2015 and November 2017, when Messer sent a single invoice to Devault in the total amount of $410,000," which constituted "a breach of its own contractual obligations"; and (2) that the freezers "were not capable of providing the production rate or liquid nitrogen cost savings that had repeatedly been promised to Devault," and therefore "[w]hether Messer complied with its own contractual obligations . . . is an issue for the trier of fact that precludes summary judgment." Devault Resp. Br. at 5–6. As for Messer's claim regarding Devault's purchase of liquid nitrogen and carbon dioxide from another supplier, Devault argues that it had properly terminated the contract due to Messer's imposition of "onerous, improper[,] and unjustified payment terms on Devault." Devault Resp. Br. at 7. Devault also argues that Messer cannot establish that it suffered any damages due to the fungible nature of liquid nitrogen, and alleges that "Messer allowed Devault to run out of liquid nitrogen on three occasions, and failed to make timely delivery on three occasions." Devault Resp. Br. at 8–9. Each of these arguments will be addressed in turn below.

First, Devault points out that Messer failed to send invoices for freezer rental payments from June 2015 until November 2017, which Messer does not dispute. *See* Messer Br. at 10–11 & n.3. But Devault cites no legal authority supporting its apparent position that Messer's delay in sending invoices for that period had the effect of eliminating, in perpetuity, Devault's obligation to pay rent for those months. The relevant section of the contract provides that Devault "shall pay all [] invoices within the 10-day period starting on the invoice date." Product Supply Agreement at § 4(a). Accordingly, pursuant to the plain language of the Agreement, the

legal effect of Messer's delay in submitting invoices for certain months was to delay triggering the start of the 10-day period during which Devault was obligated to make its rental payment for each of those months.[2]  Devault does not argue that Messer's delay in sending invoices for the months in question qualified as a material breach of the contract by Messer, and rightly so. Under New Jersey law, a breach is material when it "tend[s] to 'defeat the purpose of the contract.'"  *Magnet Res., Inc. v. Summit MRI, Inc.*, 723 A.2d 976, 981 (N.J. Super. Ct. App. Div. 1998) (quoting *Medivox Prods., Inc. v. Hoffman-LaRoche, Inc.*, 256 A.2d 803, 809 (N.J. Super. Ct. Law Div. 1969)); *see also Ross Sys. v. Linden Dari-Delite, Inc.*, 173 A.2d 258, 265 (N.J. 1961) (defining material breach as a breach that "goes to the essence of the contract").  It would be nonsensical to say that Messer's delay in sending invoices to Devault for rent owed on the freezers "defeat[ed] the purpose of the contract." *Magnet Res., Inc.*, 723 A.2d at 981 (internal quotation marks omitted).  At that point, the freezers had already been installed and were being used by Devault; the invoicing delay simply provided Devault with more time to make its rental payments.[3]

---

[2] As such, Devault's contention that Messer's "claims for freezer rent payments that were due prior to October 31, 2017[] are barred by the one[-]year statute of limitations provision in the Agreement" is rendered moot.  Devault Br. in Supp. Mot. Summ. J. at 6.  Pursuant to the express terms of the Agreement, the time within which Devault was required to make rental payments was tied to the date invoices were issued.  Product Supply Agreement at § 4(a).  Since Messer delayed invoicing Devault for the months in question until November 2017, Devault's obligation to pay for those months could not have been triggered before that time; consequently, any claim by Messer based on Devault's failure to pay rent for those months necessarily could not have accrued before that time, either.  As a result, Devault's Motion for Partial Summary Judgment "on Messer's breach of contract claim for freezer rental[] payments (and related damages) that were due on or before October 31, 2017" must be denied.  Devault Br. in Supp. Mot. Summ. J. at 6.

[3] The Court notes that there was seemingly nothing preventing Devault from making rental payments for the freezers each month, if it wished to do so, even in the absence of invoices triggering the start of the period during which it was actually obligated to make payments. Devault states in its Response Brief that it made a monthly rental payment on October 17, 2017,

7

Devault's second argument as to why it should not be required to pay rent on the freezers for the months in question is that the freezers "were not capable of providing the production rate or liquid nitrogen cost savings that had repeatedly been promised to Devault in the Proposal,"[4] which Devault argues "became part of the Agreement itself."  Devault Resp. Br. at 5.  However, as Messer sets forth in its Brief, the Agreement contained an "'Entire Agreement' clause [stating] that the Agreement constitutes all of the terms of the contract between the parties regarding its subject matter and 'supersedes and terminates all previous agreements between the Parties regarding th[e] [A]greement's subject matter.'"  Messer Br. at 2–3 (quoting Product Supply Agreement at § 15(b)).  Despite this language in the Agreement, Devault argues that the proposals—separate documents that were not executed by authorized representatives of either party—were incorporated into the Agreement by virtue of a clause contained in one of the Agreement's Term Sheets.

Specifically, Section 7 of the "Application Equipment, Ancillary Equipment, and Services Term Sheet" ("AAS Term Sheet"), which sets prices for "Services [and] Ancillary Equipment," provides that the price for "Engineering & Application Technician Services for Commissioning of the Rental Equipment and otherwise as agreed upon" was "[i]ncluded" within the terms of the Agreement, i.e., would not be charged for separately by Messer.  AAS Term Sheet at § 7.  Devault argues that the "increased production rate and reduced cost to freeze set

---

which was before Messer resumed sending invoices for rental payments owed.  *See* Devault Resp. Br. at 4–5 n.1.

[4] In the lead-up to the parties entering into the Agreement, Messer sent Devault several proposals describing the products and services it could provide.  *See* Devault Resp. to SMUF at ¶ 57. Devault attached two of these proposals to its Response.  *See id.* at Exs. A & B.  Devault's Response Brief repeatedly references "the Proposal," which appears to specifically refer to the proposal document dated August 29, 2013.  *See id.* at ¶ 58.

forth in the Proposal are matters that were 'otherwise as agreed upon' by Messer and Devault, and as a result the Proposal itself became an integral part of the Agreement."  Devault Resp. to SMUF at ¶ 77.

Messer argues in response that Devault's reading of that language within the AAS Term Sheet "is nonsensical," as it would require the Court to "conclude that instead of expressly incorporating, attaching[,] and/or referring to the August 2013 (or any other) proposal by name, the parties cryptically used the phrase 'and otherwise as agreed upon' to encompass the contents of the August 2013 proposal, which is not in the form of an agreement in any event."  Messer Reply Br. at 3.  Messer further states that the plain meaning of that language within the AAS Term Sheet "is that Messer was to provide certain technical services in connection with the commissioning of the Freezers . . . and any other *future* services the parties may agree upon."  *Id.* (emphasis in original).

"In general, where a contract contains an integration clause, the parol evidence rule bars the introduction of evidence of extrinsic negotiations or agreements to supplement or vary its terms."  *CDK Global, LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103, 2016 WL 1718100, at *3 (D.N.J. Apr. 29, 2016); *see also Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 346 (N.J. 2006) ("In general, the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document.") (citing *Restatement (Second) of Contracts* § 213 (1981)). At the same time, New Jersey courts "permit a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties," and in turn, "the true meaning of contractual terms."  *Conway*, 901 A.2d at 347.  Accordingly, "[i]t is only after the meaning of [a] contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract."  *Id.*

Applying those principles here, the relevant question is whether the parties intended to incorporate any of the proposal documents into the Agreement through the "and otherwise as agreed upon" clause contained in the AAS Term Sheet, and the parol evidence rule does not bar the Court from considering the proposals themselves insofar as they shed light on the intention of the parties with respect to that question.  However, nothing in the proposals indicates that the parties intended to incorporate those documents into the Agreement through the AAS Term Sheet's "and as otherwise agreed upon" clause, and Devault does not argue otherwise.  Devault puts forward little in support of its interpretation of the clause aside from the conclusory and self-serving statement that it "certainly understood that the Proposal was part of the agreement between Messer and Devault."  Devault Resp. to SMUF at ¶ 78 (citing deposition testimony of Devault's CEO and a Devault consultant).

In contrast, much of the language in the Agreement indicates that it was not the parties' intention to incorporate the proposal documents as additional terms of the contract.  As Messer points out, the Agreement's integration clause explicitly states that the documents executed by the parties "constitute[] all of the terms of the contract between the [p]arties" and "supersede[] and terminate[] all previous agreements between the [p]arties regarding th[e] [A]greement's subject matter."  Product Supply Agreement at § 15(b).  The integration clause expressly refers to the Product Supply Agreement, the Term Sheets, and the Riders in defining the scope of the agreement between the parties.  Notably absent is any reference to the proposals.  Messer also correctly points out that a plain reading of the AAS Term Sheet leads one to the unmistakable conclusion that the "and otherwise as agreed upon" language refers to any engineering and technician services the parties might agree are needed at a later date.  In addition, the Product Supply Agreement expressly defines the Agreement as being made up of the Product Supply

Agreement "and the related Riders and Term Sheet, collectively."  Product Supply Agreement at § 15(n).  Similarly, each of the Riders define the scope of the Agreement as "this Rider and the related Product Supply Agreement and Term Sheet, collectively."  AAS Rider at § 1; Bulk Rider at § 1.  And each Term Sheet even includes an "Incorporated Documents" section as the first item, which expressly lists the Product Supply Agreement and relevant Rider as the only documents incorporated therein.  If the parties intended to incorporate the proposals into the AAS Term Sheet, they presumably would have listed them in the "Incorporated Documents" section, which explicitly calls for that information.  Devault's argument—that the parties chose not to do so, but still actually intended to incorporate those documents through the "and otherwise as agreed upon" phrase in the list of prices for engineering and technician services— borders on frivolous, and is rejected by the Court.  *See Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006) ("'Semantics cannot be allowed to twist and distort [a contract's] words' obvious meaning in the minds of the parties.'") (quoting *Atlantic N. Airlines v. Schwimmer*, 96 A.2d 652, 658 (N.J. 1953)).

As a result, Devault's argument that "Messer has no valid breach of contract claim against Devault for failure to pay freezer rentals" because "Messer breached its own obligations under the Proposal" fails, as the proposal documents were neither contracts nor part of the Agreement signed by the parties.  Devault Resp. Br. at 6–7; *cf. Lucier v. Williams*, 841 A.2d 907, 911 (N.J. Super. Ct. App. Div. 2004) (stating "the fundamental proposition that contracts will be enforced as written" and that "courts will not rewrite contracts to favor a party, for the purpose of giving that party a better bargain"); *Quinn v. Quinn*, 137 A.3d 423, 429 (N.J. 2016) ("the parties cannot expect a court to present to them a contract better than or different from the agreement

they struck between themselves"). The proposals therefore created no legal obligations Messer could be found to have breached, leaving no factual question for trial on this issue.[5]

As for Messer's claim that Devault also breached the Agreement by purchasing liquid nitrogen and carbon dioxide from another supplier, Devault argues that it had already properly terminated the contract before the purchases were made as a result of Messer's imposition of "onerous, improper[,] and unjustified payment terms on Devault." Devault Resp. Br. at 7. Specifically, Devault claims that it "terminated the Agreement because [Messer] continued to insist that Devault make payments on a C.O.D. basis pursuant to the penalty provision set forth in § 5 of the Agreement." Devault Resp. to SMUF at ¶ 119. The parties agree that Messer invoked the penalty provision due to Devault's failure to make freezer rental payments. *See* Devault Resp. Br. at 7; Messer Br. at 12. Devault simply relies on its argument that it was not responsible for the freezer rental payments in question to argue that Messer therefore had no basis to invoke the penalty provision, and that Messer's decision to do so constituted a breach of the Agreement by Messer, which then allowed Devault to terminate the Agreement. *See* Devault Resp. Br. at 7–8. However, as the Court has already rejected Devault's argument that it had no obligation to make freezer rental payments for the months in question, it necessarily follows that Messer acted within the bounds of the Agreement when it invoked the penalty provision in

---

[5] As Devault's counterclaims for breach of contract (with respect to the rental equipment) and breach of express warranty are premised on its now-rejected argument that the proposals were incorporated into the Agreement, those counterclaims cannot stand, and Messer's motion for summary judgment on those counterclaims will therefore be granted. *See* Devault Resp. Br. at 16–18 ("the Proposal became part of the Agreement and . . . Devault was not achieving the performance and cost savings that Devault reasonably expected based on Messer's Proposal"); ("Messer's failure to provide equipment consistent with its Proposal constitutes a breach of express warranty"); ("Messer failed to work with Devault [] to provide the engineering 'services' that are contemplated by the Agreement to achieve the promised results").

Section 5.  Its decision to do so therefore could not have provided Devault with a proper basis to terminate the Agreement.[6]

Devault's argument concerning the fungible nature of liquid nitrogen runs contrary to fundamental principles of contract law and is therefore easily disposed of.  Devault argues that Messer cannot establish damages based on Devault's early termination of the contract and purchase of liquid nitrogen from another supplier because "liquid nitrogen is fungible and can be sold to any customer."  Devault Resp. Br. at 9 (footnote omitted).  However, a fundamental principle of contract law is that a party properly suing for breach of contract "is entitled to the amount of damages . . . [which] will put that party in the same position it would have been in if the breaching party had performed the contract in accordance with its terms."  *Magnet Res., Inc.*, 723 A.2d at 985 (collecting cases).  "One corollary of that rule is that if the party injured by a breach has lost profits which were reasonably anticipated to accrue from the contract, that party is entitled to recover those lost profits."  *Id.*; *see also Gardner v. The Calvert*, 253 F.2d 395, 401 (3d Cir. 1958) ("It has long been recognized that a party may recover damages for the loss of anticipated profits when they result from a breach of contract.").  Devault provides neither reasoning to justify a departure from these principles nor any legal authorities in support of its argument, which, consequently, is rejected.

Devault also argues in a footnote that "Messer allowed Devault to run out of liquid nitrogen on three occasions, and failed to make timely delivery on three occasions."  Devault

---

[6] Moreover, in emails sent by Devault employees and attached as exhibits to Devault's Response submitted to the Court, it is acknowledged that Devault fell behind on payments owed to Messer. *See, e.g.*, Apr. 30, 2018 email from J. McDermott, Devault's CFO (included in Exhibit K to Devault Resp. to SMUF) ("Devault fell behind on its payments for the [freezers] and occasionally for the nitrogen. Part of that was due to some short term cash issues but also to raise the point with [Messer] that this solution is far worse than promised.").

Resp. Br. at 8 n.3.  Devault does not expressly argue in its Response Brief that the purported late deliveries constituted a material breach of the Agreement by Messer that permitted Devault to terminate the Agreement, but even if it had, such an argument would fail.  Even assuming the purported late deliveries constituted a material breach of the Agreement by Messer, "a contracting party alleging material breach by the counterparty must make 'a genuine election of continuing performance or of ceasing to perform, and any action indicating an intention to perform will operate as a conclusive choice.'"  *Ramada Worldwide Inc. v. Clinton Com. Dev., LLC*, No. 11-4920, 2016 WL 5402204, at \*2 (D.N.J. Sept. 26, 2016) (quoting *Frank Stamato & Co. v. Borough of Lodi*, 71 A.2d 336, 339 (N.J. 1950)) (alterations omitted).  In other words, "a party may waive the materiality of the other party's breach and continue performance of the contract," thereby "'depriving it of any excuse for ceasing performance on its own part.'"  *Luma Enters., LLC v. Hunter Homes & Remodeling, LLC*, No. A-6094-11T3, 2013 WL 3284130, at \*5 (N.J. Super. Ct. App. Div. July 1, 2013) (quoting *Frank Stamato & Co.*, 71 A.2d at 339) (alterations omitted).

Here, the only specific factual support Devault provides in support of its argument concerning Messer's purportedly late deliveries indicates that a delivery issue occurred, at the latest, in March 2018.  *See* Devault Resp. to SMUF at Ex. BB.  Yet Devault continued purchasing liquid nitrogen from Messer for almost another year after that point.  *See* Expert Rpt. of Barry E. Renninger at 3 (Ex. H to Devault Resp. to SMUF) (stating that Devault "stopped buying nitrogen from Messer on February 5, 2019"); Devault Resp. to SMUF at ¶ 117 (stating that Devault "terminated the Agreement and entered into a new agreement with an alternative supplier," citing the February 8, 2019 letter from Devault's counsel to Messer's counsel).  Accordingly, it cannot seriously be argued that Devault's continued performance of purchasing

14

and paying for liquid nitrogen from Messer for that nearly year-long period constituted anything

other than an "action indicating an intention to perform," which therefore "operate[d] as a

conclusive choice" on Devault's part. *Ramada Worldwide Inc.*, 2016 WL 5402204, at *2

(internal quotation marks and alterations omitted). Simply put, Devault cannot point to a few

late product deliveries to justify its attempt to terminate the contract almost a year later.[7]

Based on the foregoing analysis, as each of Devault's arguments against Messer's motion

for summary judgment on its breach of contract claim have been rejected, and the Court having

found that Messer has sufficiently established the absence of a genuine issue of material fact

with respect to each of the elements of its breach of contract claim, Messer's motion for

summary judgment on that claim will be granted.

### B.  Devault's Counterclaim for Breach of Contract (Liquid Nitrogen)

Devault defines its remaining breach of contract claim as follows:  "Devault's breach of

contract claim for liquid nitrogen is based on Messer's imposition of onerous, unjustified[,] and

improper payment terms, threats to cut off nitrogen supply without further notice, missing

deliveries and allowing Devault to run out of liquid nitrogen on 3 occasions, and submitting

invoices that were late, inaccurate, inconsistent[,] and devoid of explanation."  Devault Resp. Br.

at 20.  As already discussed, the payment terms Devault complains of were specifically provided

for in Section 5 of the Product Supply Agreement, and Messer acted within its rights in invoking

---

[7] Devault also makes the vague allegation in a footnote that Messer's "invoices were frequently late, inaccurate, inconsistent[,] and devoid of sufficient explanation."  Devault Resp. Br. at 8 n.3. As with Devault's complaint regarding late deliveries, Devault does not explicitly argue that these purported issues with Messer's invoices constituted a material breach that permitted Devault to terminate the Agreement.  But even if it had, such an argument would also fail; as explained above, it cannot reasonably be said that the purported invoicing issues "defeat[ed] the purpose of the contract."  *Magnet Res., Inc.*, 723 A.2d at 981 (internal quotation marks omitted).

that provision of the contract.  The same is true with respect to the alleged "threats to cut off nitrogen supply."  *Id.*; *see* Product Supply Agreement at § 5 ("If [Devault] fails to pay when due any payment required under this agreement, . . . then [Messer] may take any one or more of the following actions[:] . . . (1) refuse to make further deliveries of Product to [Devault]; (2) place [Devault] on a C.O.D. basis . . . .").

The remaining grounds on which Devault premises its claim fail to establish the existence of an element essential to that claim.  As set forth above, one of the elements a party must establish in order to prove a breach of contract claim is that it suffered damages as a result of the alleged breach.  *See Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).  As to Devault's claim regarding the allegedly late deliveries, the parties' contract contains a "sole remedy" clause limiting Devault's remedy in the event of "a breach of [Messer's] obligation to deliver Product as required under" the Agreement.  Product Supply Agreement at § 9(c). Specifically, the Agreement provides Devault with the following, exclusive remedy for such a breach:  Messer must "deliver to [Devault], free of charge, the quantity of Product that [Messer] failed to deliver as required."  *Id.*  Messer explicitly identified this clause in its opening brief as a reason why Devault's breach of contract claim concerning liquid nitrogen must fail (*see* Messer Br. at 24–25), but Devault's Response Brief fails to refute the point or address the Agreement's "sole remedy" clause at all.  *See* Devault Resp. Br. at 20.  Devault certainly has neither alleged nor provided any factual support for a claim that Messer failed to provide Devault with any liquid nitrogen it failed to timely deliver in the first instance pursuant to that clause. Accordingly, Devault "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).[8]  Accordingly, "Rule 56(c) mandates the entry of summary

judgment" on Devault's fifth counterclaim.  *Celotex*, 477 U.S. at 322.

### C.  Devault's Counterclaim for Fraudulent Inducement

Devault's final counterclaim is that Messer fraudulently induced it to enter into the

Agreement based on representations made in the proposal documents.  *See* Devault Answer and

Countercls. at ¶¶ 65–73.  Messer argues that this counterclaim is precluded by the contract's

"Entire Agreement" (or "integration") clause, in which the parties "disclaim[ed] all prior

representations and/or statements concerning the subject matter of the Agreement."  Messer Br.

at 18.  Devault disagrees, likening this case to *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No.

15-3103, 2016 WL 1718100 (D.N.J. Apr. 29, 2016), where the "District Court concluded that

[the party's] misrepresentations concerned matters extrinsic to the [contract], and that 'such

allegations could support a claim of fraudulent inducement, as opposed to breach of contract, and

therefore would not be barred by the [contract's] integration clause.'"  Devault Resp. Br. at 14–

15 (quoting *CDK Glob., LLC*, 2016 WL 1718100, at *4) (alterations omitted).

Devault argues that the "misrepresentations [it alleges] do not fall within the ambit of the

integration clause in the Agreement," as "the Agreement does not specifically speak to Devault's

particular business needs or how Messer would work to meet those requirements."  Devault

Resp. Br. at 15.  This Court agrees.  As it has already been determined that the proposals were

---

[8] Devault's argument concerning its issues with Messer's invoices similarly fails to establish the
existence of any damages it suffered—"or, for that matter, could have suffered"—as a result of
that alleged breach.  Messer Br. at 21.  Nowhere in Devault's Response Brief does it identify any
damages suffered specifically related to the lack of explanatory detail included in Messer's
invoices.  *See also* Devault Answer and Countercls. at "Count V – Breach of Contract (Liquid
Nitrogen)" (including only the conclusory statement that "[t]he breach by [Messer] has caused
Devault damages").

17

not included as part of the parties' Agreement, Devault's claim for fraudulent inducement, which is based on alleged misstatements made by Messer within the proposals, necessarily "concern[s] matters extrinsic" to the Agreement, and therefore is not barred by the Agreement's integration clause. *CDK Glob., LLC*, 2016 WL 1718100, at *4; *see also* Devault Resp. Br. at 15 ("Devault's fraudulent inducement claim is based on the August 29, 2013 Proposal, and the specific performance[] calculations and representations that were made in the Proposal.").

However, that does not end the inquiry. As previously discussed, summary judgment is mandated when "a party [] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To defeat summary judgment from being entered on its fraudulent inducement counterclaim, Devault "must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations and footnote omitted); *see also Celotex*, 477 U.S. at 324 (stating that the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial") (internal quotation marks omitted). As Devault correctly states, "[t]o succeed on a fraudulent inducement claim, a plaintiff must establish (1) a material misrepresentation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." Devault Resp. Br. at 11–12 (citing *RNC Sys., Inc. v. Mod. Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012)).[9] But as Messer correctly points out, "Devault has not offered any evidence" to

---

[9] The Court finds the Agreement's choice of law clause sufficiently broad in scope to cover Devault's fraudulent inducement counterclaim, a tort-based claim (as opposed to a contract-based claim arising from the Agreement itself). The clause explicitly states that "New Jersey law

establish that Messer "made a material misrepresentation *with knowledge of its falsity*." Messer Reply Br. at 7 (emphasis in original). The only instance in any of the various documents submitted to the Court by Devault in which anything bearing upon this element is even mentioned appears in a single sentence of its "Additional Disputed Material Facts." *See* Devault Resp. to SMUF at ¶ 91 ("Messer knew that the freezer tunnels proposed to Devault were inadequate to meet Devault's needs and could not meet the pound per hour Devault had been promised."). But Devault fails to cite a single piece of evidence or any specific fact to support that conclusory statement. *See id.* (citing only deposition testimony supporting the uncontested proposition that Devault complained to Messer about the freezers' performance).

Again, Devault states that its "fraudulent inducement claim is based on the . . . specific performance[] calculations and representations that were made in the Proposal" dated August 29, 2013. Devault Resp. Br. at 15. The Court assumes the "performance calculations" Devault refers to is the information contained within the section of the proposal documents entitled "Spreadsheet Scenarios." *See* Devault Resp. to SMUF at Ex. B (p. 21 of 247 within ECF No. 33-4).[10] To succeed on a claim for fraudulent inducement based on those calculations, Devault would need to establish not just that it was unable to attain the production rates and/or efficiencies modeled in the various "Spreadsheet Scenarios," but that Messer *knew* Devault

---

governs all matters pertaining to the validity" of the Agreement, which is precisely what Devault's fraudulent inducement counterclaim seeks to challenge. Product Supply Agreement at § 15(c); *see also Corestates Bank, N.A. v. Signet Bank*, No. 96-3199, 1996 WL 482909, at *5 n.3 (E.D. Pa. Aug. 26, 1996) (applying contractual choice of law provision to fraudulent inducement claim, which "directly assail[ed] the validity of the contract, [where] the [c]ontract's choice of law clause explicitly state[d] that it encompasse[d] matters of validity"). Devault has not argued that the laws of any other state should instead apply to this counterclaim.

[10] The actual spreadsheet document is attached only to the proposal dated June 7, 2013. *See* Devault Resp. to SMUF at Ex. A (p. 11 of 247 within ECF No. 33-4).

would be unable to attain those numbers when it included them in the proposals.  *See* Devault

Resp. Br. at 12 ("'In the instance of a fraudulently induced contract, a *knowing misstatement* has

been made, on the basis of which the defrauded party signs the instrument.'") (quoting *Deerhurst*

*Ests. v. Meadow Homes, Inc.*, 165 A.2d 543, 548 (N.J. Super. Ct. App. Div. 1960)) (emphasis

added).[11]  But Devault has not adduced even a "scintilla of evidence" supporting such a

conclusion.  *Williams*, 891 F.2d at 460.  Accordingly, its fraudulent inducement counterclaim

cannot stand, and Messer's motion for summary judgment on that count will be granted.[12]

---

[11] It is worth noting that the calculations at issue were projections of future performance, or
"estimates," which were updated and changed several times throughout the course of the parties'
negotiations, rather than straightforward calculations of objectively measurable, static
information.  *See* Devault Resp. to SMUF at ¶ 79 ("'with each iteration of our proposal . . . . the
scope of what we learned changed, which then therefore changed what our estimates would be
on performance.'") (quoting E. Fihlman Dep. at 48:4–17); E. Fihlman Dep. at 95:5–8 ("So if I
look at my first estimates to my last, there was seemingly many adjustments made to what
ultimately could be calculated as [to the] cost to freeze.").  Devault also does not explain how
these projections could serve as the basis for a fraudulent inducement claim under New Jersey
law, which requires "a material misrepresentation of a *presently existing or past fact*."  *RNC Sys.,
Inc.*, 861 F. Supp. 2d at 451 (emphasis added); *see also Bancorp Bank v. Condor Devs., LLC*,
No. 15-4451, 2019 WL 1976424, at *8 (D.N.J. May 3, 2019) (granting summary judgment on
fraudulent inducement counterclaim premised not on "misrepresentations of the past or current
state of affairs but rather a prediction of a future [event] that was itself dependent on [a]
contingency"); *Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc.*, No. 02-2889, 2005 WL
3164205, at *8 (D.N.J. Nov. 10, 2005), *aff'd* 244 F. App'x 522 (3d Cir. 2007) ("any prediction . .
. that [the defendant] would enjoy a 15% increase in sales related to future event and cannot
constitute fraud in the inducement, because a statement relating to future events cannot satisfy
the element of being a statement that is known to be false at the time it is made") (citing
*Anderson v. Modica*, 73 A.2d 49 (N.J. 1950) and *Van Dam Egg Co. v. Allendale Farms, Inc.*,
489 A.2d 1209 (N.J. Super. Ct. App. Div. 1985)).

[12] Accordingly, summary judgment must also be entered on Devault's counterclaim for breach of
implied warranty.  As identified by Messer, and acknowledged by Devault, all "implied
warranties [were] disclaimed on the face of the Agreement."  Devault Resp. Br. at 19; *see also*
Product Supply Agreement at § 9(b) ("[Messer] specifically disclaims all implied warranties for
the products and the rental equipment, including the implied warranties of merchantability and
fitness for any particular purpose.") (emphasis omitted).  Devault's only argument against
dismissal of this counterclaim is that, "to the extent that Devault's fraudulent inducement claim
succeeds, any disclaimer of implied warranties in the Agreement would be ineffective and
unenforceable."  Devault Resp. Br. at 19.  As the Court finds that Devault's fraudulent

**IV.      CONCLUSION**

For the foregoing reasons, Messer's Motion for Partial Summary Judgment is granted with respect to Devault's liability under its breach of contract claim, as well as on each of Devault's counterclaims, and Devault's Motion for Partial Summary Judgment is denied.

An appropriate Order follows.

BY THE COURT:


/s/ C. Darnell Jones, II
C. Darnell Jones, II    J.

---

inducement counterclaim cannot survive summary judgment, its counterclaim for breach of implied warranty necessarily cannot survive, either.